UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| A.G.C., ) | |
| By Damaris Santiago Martinez, ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No.16-30015-KAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security Administration, ) | |
| Defendant ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
TO AFFRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 16 & 25)

ROBERTSON, U.S.M.J.

Before the court is an action for judicial review of a final decision by the acting Commissioner of the Social Security Administration ("Commissioner") regarding the plaintiff's entitlement to Supplemental Security Income ("SSI"). Plaintiff Damaris Santiago Martinez ("Plaintiff"), on behalf of her son A.G.C. ("A.G.C."), asserts that the Commissioner's decision denying A.G.C. SSI benefits, which denial was memorialized in a July 8, 2014 decision by an administrative law judge ("ALJ"), was not based on substantial evidence. Plaintiff has filed a Motion for Judgment on the Pleadings, while the Commissioner has filed a competing Motion to Affirm the Commissioner's Decision, in which the Social Security Administration ("SSA") argues that the Commissioner's decision was supported by substantial evidence.

The parties have consented to this court's jurisdiction (Dkt. No. 17). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court will allow the Commissioner's motion to affirm, and deny Plaintiff's motion for judgment on the pleadings.

1

I.  PROCEDURAL BACKGROUND

Plaintiff filed a protective application for SSI benefits on April 23, 2010 alleging a December 13, 2002 onset of disability (Administrative Record ("A.R.") at 311-317). The application was denied initially and on reconsideration. Following a December 12, 2011 hearing, the ALJ found that A.G.C. was not disabled (*id.* at 181-199). The Appeals Council remanded the case to the ALJ for review and discussion of records from A.G.C.'s school (*id.* at 200-03). Following a second hearing, the same ALJ again determined that A.G.C. was not disabled (*id.* at 70-87). The Appeals Council denied review (*id*. at 1-6), and this appeal followed.

II. DISABILITY STANDARD

The Social Security Act defines a child under the age of 18 as disabled if the child "has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). When a claim for benefits is made on behalf of a child under the age of 18, the Commissioner must determine whether the child's alleged impairment is severe. 20 C.F.R. § 416.924(a)(c). If an impairment is found to be severe, "the question becomes whether the impairment is one that is listed in, or medically or functionally equals, the Listings." *Blackmore ex rel. v. Astrue*, Civil No. 09-385-P-S, 2010 WL 2674594, at *1 (D. Me. June 29, 2010), *adopted*, 2010 WL 2899704 (D. Me. July 19, 2010) (citing 20 C.F.R. 416.924(a)).

> The Social Security regulations include a three-step test for the purpose of adjudicating children's disability claims . . . 20 C.F.R. § 416.924(b)-(d). That test, known as the Children's Benefit Analysis, requires the ALJ to determine: (1) whether the child is engaged in "substantial gainful activity," (2) whether the child has "a medically determinable impairment[] that is severe," and (3) whether the child's impairment(s) . . . meet, medically equal, or functionally equal [a]

list[ed impairment.]" *Id.*; *see generally Fleetwood v. Colvin*, 103 F. Supp. 3d 199, 202-03 (D.R.I. 2015). A negative answer at any step precludes a finding of disability. 20 C.F.R. § 416.924(a). "The claimant seeking [childhood] benefits bears the burden of proving that his or her impairment meets or equals a listed impairment." *Hall ex rel. Lee v. Apfel,* 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).

In considering whether the child has an impairment or combination of impairments that functionally equals the severity of a listing, the six functional equivalence domains set forth in the regulations must be considered. 20 C.F.R. § 416.926a(g)-(l). They are:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for oneself; and

6. Health and physical well-being.

*See* 20 C.F.R. § 416.926a(b)(I). To qualify as functionally equivalent to a listing, the child's impairment "must result in [either] 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The child has a "marked" limitation – i.e., one "that is 'more than moderate' but 'less than extreme'"– when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). The child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

*Costa O/b/o X.C. v. Colvin*, C.A. No. 15-540ML, 2016 WL 7974120, at *5 (D.R.I. Dec. 21, 2016), *adopted*, 2017 WL 354284 (D.R.I. Jan. 24, 2017). The functional equivalence rules require the Commissioner to consider how a child seeking SSI benefits "functions every day and in all settings compared to other children the same age who do not have impairments." SSR 09-1P, 2009 WL 396031, at *2 (2009). An ALJ is required to evaluate the "whole child" when making a finding regarding functional equivalence. *Id.*

3

III.     STANDARD OF REVIEW

The standard of review that this court applies in reviewing a decision by the Commissioner does not change when the claimant is a minor. *See Miller ex rel K.M. v. Astrue*, Civil Docket No. 2009-12108-RBC, 2011 WL 2462473, at \*\*7-8 (D. Mass. June 16, 2011). A court may not disturb the Commissioner's decision if it is grounded in substantial evidence and based on the correct legal standard. *See* 42 U.S.C. § 1383(c)(3); *see also, e.g., Smith v. Astrue,* 851 F. Supp. 2d 305, 307 (D. Mass. 2012). A court must uphold the findings of the Commissioner "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion.'" *Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)). "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. The resolution of conflicts in the evidence is for the [Commissioner], not the courts." *Ortiz,* 955 F.2d at 769 (citing *Rodriguez,* 647 F.2d at 222). "Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusions.'" *Greene v. Astrue,* No. 11-30084, 2012 WL 1248977, at \*1 (D. Mass. April 12, 2012) (quoting *Ortiz,* 955 F.2d at 769). That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

IV.     THE ALJ'S DECISION

In the instant case, the ALJ followed the required three-step sequential evaluation in determining whether A.G.C. was disabled. The ALJ found that A.G.C. was school-aged when his application was filed and an adolescent at the time of the second hearing before her, and that

he had not engaged in substantial gainful activity since the April 23, 2010 application date. She found that A.G.C. had two severe impairments: Attention Deficit Hyperactivity Disorder ("ADHD"), and a mood disorder. Because ADHD and mood disorders are listed impairments, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B §§ 112.04, 112.11, the ALJ considered whether the A.G.C.'s ADHD or his mood disorder met the severity requirements of each of these listings, and concluded that neither the functional limitations caused by A.G.C.'s ADHD, nor the functional limitations caused by his mood disorder met or equaled in severity the limitations that would have rendered these impairments per se disabling (A.R. at 76).

She then turned to the key question in this case: whether A.G.C.'s impairments, singly or in combination, were the functional equivalent of a listed impairment. After summarizing record evidence from a variety of sources, including school records, mental health treatment records, and psycho-social evaluations, she made findings as to the six domains of functioning.[1] She found that A.G.C. had: (1) no limitation in acquiring and using information; (2) a less than marked limitation in attending and completing tasks; (3) a less than marked limitation in interacting and relating with others; (4) no limitations in moving about and manipulating objects; (5) a less than marked limitation in the ability to care for himself; and (6) no limitation in health and physical well-being. She therefore concluded that A.G.C. had not been under a disability from April 23, 2010, the date the SSI application was filed to the date of her decision (*id.* at 86). *See Costa*, 2016 WL 7974120, at *8; *Miller ex rel. K.M.*, 2011 WL 2462473, at *15.

---

[1] The record in this case consists of more than 1,000 pages. The Appeals Council remanded this case to the ALJ with directions to discuss Exhibits 8E and 12E-17E, all of which were records from A.G.C.'s school. Accordingly, the ALJ's evidentiary summary focused primarily, although not exclusively, on the records she had been directed to discuss on remand (A.R. at 77-79). The ALJ nonetheless represented that she had considered all of the record evidence in reaching her decision following remand (*id.* at 73).

V. ANALYSIS

In Plaintiff's memorandum in support of her motion for judgment, Plaintiff does not appear to take issue with the ALJ's finding that neither the Child's ADHD nor his mood disorder met the severity requirements set forth in the listings for those impairments, nor does she take issue with the ALJ's findings regarding domains 1, 4, 5, or 6.[2] Rather, Plaintiff challenges the ALJ's findings as to domains 2 and 3, arguing that the ALJ made these findings by cherry picking positive comments and ignoring record evidence in violation of the precepts set out in the First Circuit's *Nguyen* opinion (Dkt No. 17 at 11, 20). *See Nguyen*, 172 F.3d at 35. Accordingly, the court will address the ALJ's findings as to the two domains at issue in turn, with reference to the relevant opinion and other record evidence.

A. Attending and Completing Tasks

In the domain of attending and completing tasks, the Commissioner is charged with considering how well a child is "able to focus and maintain . . . attention, and how well [the child] begin[s], carr[ies] through, and finish[es] [the child's] activities, including the pace at which [the child] perform[s] activities and the ease with which [the child] change[s] them." 20 C.F.R. § 416.926a(h). A school age child (age 6 to 12) without an impairment would be expected to be able to focus his or her attention in order to follow directions, remember and organize school materials, and complete classroom and homework assignments. Such a child would also be able to change activities without distracting him- or herself or others, stay on a task, such as reading or completing a chore, and be able to transition between tasks without extra reminders or accommodations. *See* 20 C.F.R. § 416.926a(h)(iv). An enhanced ability to concentrate, for a longer period and on more complex material, would be expected of a child 12

---

[2] Because there is no dispute about the findings as to these four domains, the court will not discuss them further in this Memorandum and Order.

years of age or older who did not suffer from an impairment in this domain. *See* 20 C.F.R. § 416.926a(h)(v).

Plaintiff's contention that the ALJ improperly ignored evidence that would have resulted in a conclusion that A.G.C. had at least a marked limitation in the domain of attending and completing tasks does not stand up to scrutiny. While there is conflicting evidence in the record about the child's abilities and functional limitations in this domain,[3] there is substantial evidence, as set forth below, to support the ALJ's conclusion that A.G.C.'s impairments in this domain did not interfere seriously with his ability to initiate, sustain, or complete activities.

1. School Records

In September 2009, A.G.C. was referred by his teachers to psychologist Frank Hernandez, Ph.D, to obtain an assessment of his behavioral and cognitive profile and determine the need for changes to his psychotherapeutic and educational plan (A.R. at 810). Dr. Hernandez's behavioral observations during the evaluation were largely positive. A.G.C. seemed to have only moderate difficulties in focusing effectively, and had mild to moderate lapses in sustained attention, which were observed only when he was presented with challenging tasks that demanded simultaneous processing skills. He was cooperative and complied with instructions (*id.*). Dr. Hernandez identified significant weaknesses in the areas of social comprehension, attention to details, planning, organizational, emotional regulation, and mental flexibility skills (*id.* at 813) sufficient to warrant special services for A.G.C. in the classroom.

In October 2009, immediately after this evaluation was conducted, an educational assessment completed by a teacher stated that A.G.C. was significantly above his peers

---

[3] The SSA regulations define functional limitations as "what a child cannot do, has[s] difficulty doing, need[s] help doing, or [is] restricted from doing because of [the child's] impairment(s)." 20 C.F.R. § 416.926a(a).

academically despite difficulties in paying attention and fidgeting. Episodes of frustration had decreased and he was better able to handle his emotions (*id.* at 430). Related records from this time period were largely benign (*id*. at 431-434, 427). At the conclusion of the 2009-2010 school year, a teacher questionnaire measuring A.G.C.'s functions compared to those of a child without impairments reported obvious problems on a daily basis with A.G..C.'s ability to attend to and complete tasks, and, to a lesser degree, problems with his interactions and relations with others (*id.* at 377-78). Viewed in their totality, however, A.G.C.'s records suggest that his problems at this time were, at least in part, attributable to or exacerbated by a tense and difficult home situation leading up to his parents' divorce. Following Dr. Hernandez's assessment, A.G.C.'s school implemented an accommodation plan for him for the 2010-2011 school year (*id.* at 383-85). The accommodation plan had positive results: in December 2010 and at the conclusion of the 2010-2011 school year, A.G.C.'s teachers reported that A.G.C. was making good progress, and that, despite some inconsistency in his moods and behavior, he was putting forth his best efforts in his academic work (*id.* at 422, 425).

At the beginning of the next school year (2011-201), Vanderbilt ADHD diagnostic reports noted issues of varying severity with paying attention and completing tasks, but reported nothing in A.G.C.'s classroom behavioral performance that warranted a characterization of problematic (*id.* at 437, 439, 441). An Individualized Educational Program ("IEP") report covering the period from December 2012 to December 2013 reported that A.G.C.'s overall academic achievement was in the average range, a result that his teachers and other professionals involved in delivering services under his IEP characterized as "significant" in light of his daily challenges with ADHD, anxiety, and depression (*id*. at 456).

      2.   <u>Mental Health Records</u>

Relevant mental health records included records from the Baystate Health Partial Hospitalization Program ("Baystate Program"), to which A.G.C. was referred by his treating psychologist in late November 2010, and from which he was discharged in mid-December 2010. The referral was in response to depressive symptoms in the context of his parents' separation and divorce (*id.* at 820). The discharge summary stated that the Baystate Program staff "did not witness the [intensity] of [A.G.C.'s] behaviors as described by parents" and "learned that the most intense behaviors from [A.G.C.] were one to three years ago" (*id*. at 817, 819). The staff saw a young man who sought attention in healthy and not so healthy ways, and who, in a few incidents, acted out when he did not receive the attention he sought. For the most part, the staff saw "a polite and compliant young man who complete[d] his work most days" (*id*. at 819).

A psycho-educational assessment completed when A.G.C. was 12 reported overall test scores in the average range and academic skills in the high average range, findings that, again, were considered significant in view of his challenges with ADHD, anxiety, and depression (*id.* at 963, 967). The report indicated that A.G.C. was able to manage his behaviors and emotions at school but that there were problems at home as indicated by his mother (*id.* at 967). His treating psychiatrist noted in June 2013 that A.G.C.'s mother reported that he had been doing well behaviorally at school and at home (*id.* at 1007). In 2012 and 2013, A.G.C.'s treating psychiatrist consistently recorded GAF scores of 55 for A.G.C. (*id*. at 1010, 1014, 1018, 1022, 1026, 1031, 1036, 1041, 1046).[4]

---

[4] A GAF score between 51 and 60 indicates moderate difficulty in social, occupational, or school functioning. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 1994). Having been directed by the Appeals Council to focus on the Child's school records on remand, the ALJ did not specifically refer to the records from the Child's treating psychiatrist or to the GAF scores contained therein, but she represented that she had reviewed all of the records. "There is no requirement that the ALJ discuss every bit of evidence in the record when penning [her] decision." *Miller ex rel. K.M.*, 2011 WL 2462473, at

3. Consultant's Report

"[B]ecause State agency medical consultants are considered experts in the evaluation of disability claims, the Social Security regulations 'require administrative law judges . . . to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians.'" *Peltonovich v. Colvin*, Civil Action No. 13-11246-JGD, 2014 WL 4716190, at *11 (D. Mass. Sept. 19, 2014), *aff'd*, No. 14-2212 (1st Cir. Aug. 24, 2015) (quoting SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). Reports from non-examining non-testifying consultants are "entitled to evidentiary weight, which will vary with the circumstances." *Berrios Lopez v. Sec'y of HHS*, 951 F.2d 427, 431 (1st Cir. 1991). An ALJ is entitled to rely on the report of an expert consultant who has not had an opportunity to review all of the evidence in the record so long as the report is consistent with more current information, or more recent evidence tends to show an improvement in the claimant's condition. *See Blackette v. Colvin*, 52 F. Supp. 3d 101, 114 (D. Mass. 2014) (collecting cases).

---

*11 (citing *N.L.R.B. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999)); *see also Quigley v Barnhart*, 224 F. Supp. 2d 357, 369 (D. Mass. 2002) ("[T]here is no explicit requirement that the ALJ make findings regarding every piece of evidence that is entitled to weight.").

"The GAF scale provides a 'rough estimate of an individual's psychological, social, and occupational functioning.'" *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)). The GAF scale has recently fallen out of favor as an assessment tool, and the American Psychiatric Association abandoned GAF scores in the fifth edition of its Diagnostic and Statistical Manual of Mental Disorders. *See id.* The SSA has said that it will continue to receive and consider GAF scores just as it would other opinion evidence, but that such scores must have supporting evidence to be given significant weight. *See id.* (citing SSA Administrative Memorandum AM-13066; *Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D.R.I. 2014)); *see also Costa*, 2016 WL 7974120, at *1 n.2. The GAF scores from the Child's treating psychiatrist are consistent with evidence in the record as a whole, and with evidence to which the ALJ made specific reference.

As the Plaintiff contends, an ALJ is not entitled to judge matters entrusted to experts (Dkt. No. 17 at 11). *See Nguyen*, 172 F.3d at 35; *see also Blackette*, 52 F. Supp. 3d at 115-16. In the instant case, Plaintiff did not proffer expert opinion evidence, from a treating source or otherwise, to support the claim that A.G.C.'s impairments rose to the level of marked or extreme. Where there was no other expert opinion evidence in the record addressing the extent of A.G.C.'s functional limitations caused by his impairments, the ALJ appropriately relied on the October 22, 2010 report of State agency consultant psychologist B. Lipetz, who concluded on the basis of a record review that A.G.C. had an impairment or combination of impairments that were severe, but did not meet, medically equal, or functionally equal an impairment in the listings (A.R. at 78, 665). With respect to attending and completing tasks, the psychologist noted that A.G.C. was said to be reactive to his peers, functioned better when paired with a better functioning peer, and was taught in a regular classroom with accommodations (*id.* at 667). As a state agency expert in the field of psychology, and an expert in Social Security disability evaluations, psychologist B. Lipetz evaluated all of the evidence in the record as of the date of the evaluation, and concluded that, although A.G.C. clearly had a severe limitation in attention, his behaviors did not indicate a marked impairment in this domain (*id.* at 670). *See Costa*, 2016 WL 7974120, at *7. This opinion, on which the ALJ was entitled to rely because more recent information from A.G.C.'s treating psychiatrist and his school records after the date of the evaluation were consistent with the earlier records or tended to show some measure of improvement in the domain of attending and completing tasks, *see Blackette*, 52 F. Supp. 3d at 114, provides a substantial basis in the evidence for the ALJ's finding that A.G.C.'s functional limitations in the domain of attending and completing tasks was less than marked. *See, e.g., id.* at 116.

Plaintiff is not explicit in identifying the activities in which she contends that A.G.C. has marked limitations, but the discussion in Plaintiff's memorandum is focused on school records and notes in other records related to A.G.C.'s school performance (Dkt. No. 17 at 6-11). There was certainly evidence in the record that the Child's impairments interfered with his ability to focus on and complete his academic assignments and that his ADHD negatively affected his academic performance. Indeed, the ALJ acknowledged that A.G.C. has weaknesses in the areas of social comprehension, attention to details, planning, organization, emotional regulation, and mental flexibility, and that his impulsivity interfered with his ability to learn (A.R. at 82). The record also shows however, that teachers and other professional involved in delivering services to him commented that his scholastic performance, which measured in the average range across a broad range of skills and subjects, was a significant achievement considering his ADHD, anxiety, and depression. To the extent the evidence in the record was conflicting about the extent of A.G.C.'s functional limitations in the domain of attending and completing tasks, it was up to the ALJ to resolve such conflicts. *See Ortiz*, 955 F.2d at 769. As the ALJ found, to A.G.C.'s credit, his overall academic performance was good (A.R. at 81). Thus, his functional limitations did not interfere "seriously" with his ability to independently initiate, sustain or complete tasks, which is the standard for finding a marked limitation in this domain. *See* 20 C.F.R. § 416.926a(e)(2)(i). Because a reasonable mind, "reviewing the evidence in the record as a whole, including the consultative report, could accept it as adequate to support [the ALJ's] conclusions," *Greene*, 2012 WL 1248977, at *1, the ALJ did not err in finding that the Child had a less than marked limitation in attending and completing tasks (A.R. at 82).

    B.  <u>Interacting and Relating With Others</u>

Plaintiff's contention that the ALJ's finding in this domain lacks a substantial basis in the evidence is even less persuasive. In this domain, the SSA considers how well a minor claimant "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [the claimant's] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[]s and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i).

Much of the evidence in the record about A.G.C.'s functional impairments in the domain of interpersonal relationships came from his mother. At the hearing, A.G.C's mother testified that she was worried about her son's vandalism, about him hurting himself, and about his disrespect for authority (*id.* at 151). In a Disability Report completed by the mother in support of A.G.C.'s disability application, his mother's representations about his conditions were quite dire. She represented that A.G.C. had ADHD:

> With total lack of focus and even menial task, only excells in areas of interest such as art, [A.G.C.] is easily distracted, argumentative, hostile and repulses any discipline and has total lack of respect for any authority. [A.G.C.] has major at risk problems in four behavioral attitudes and skills (sic).

(*Id.* at 336).

In her credibility determination, the ALJ found that A.G.C.'s medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that statements about the intensity, persistence, and limiting effects of his symptoms made by the claimant and his mother were only "somewhat credible" (*id.* at 80). The ALJ was not required to credit Plaintiff's or A.G.C.'s testimony about the extent of A.G.C.'s functional limitation as long as there was substantial evidence in the record to support the ALJ's reservations about this evidence. *See, e.g., Miller ex rel K.M.*, 2011 WL 2462473, at *13; *see also Botelho v. Colvin*, 153 F. Supp. 3d 451, 462 (D. Mass. 2015) (ALJ not required to credit claimant's testimony). Here, there was such evidence.

The ALJ relied on a "substantial disparity" between the reports from the Plaintiff and A.G.C. about his behavioral problems, and the objective evidence in the record. There are, in fact, substantial disparities. Although there is evidence of interpersonal conflicts with peers and, occasionally, with teachers, there is also ample evidence in the record, including in school records and in providers' notes, attesting to A.G.C.'s ability to interact and relate well with his teachers and peers. By way of example, in his IEP program description for 2012-2013, A.G.C. is described as a "creative young man who gets along easily with his peers and most adults," (A.R. at 455); in the Baystate Program discharge statement, he is described as a "compliant young man . . . who enjoys the company of his peers" (*id*. at 819); in another record from the Baystate Program, A.G.C.'s school social worker is reported to have told the program staff that she did not see him as the aggressive, violent child his mother described (*id*. at 910); and in the record of a November 2012 psycho-educational assessment, A.G.C. described himself as someone who liked school and his teachers and gets along with his peers, and who was able to manage it when he got angry at school (*id.* at 960). Consultative psychologist B. Lipetz, on whose opinion the ALJ was entitled to rely, observed that A.G.C. was noted to have issues of defiance and disrespect, to fight with his brother, and to have frequent problems with his peers in the classroom (A.R. at 668). Based on a review of the records, however, the psychologist found that A.G.C.'s behavioral problems, while severe, did not indicate a marked impairment in getting along with others because he was responding to "significant family conflict which [wa]s apparently ongoing" and he remained in a regular classroom with accommodations (*id*. at 670).

There is no doubt that A.G.C.'s mother is deeply caring and supportive, and it is apparent from the contents of the hearing transcript that the ALJ considered her to be so (*id.* at 158-68). At the same time, the record indicates that A.G.C.'s parents had difficulties accepting that

A.G.C. did not have marked limitations in his ability to control his behavior, and that, as found by the ALJ, his primary interpersonal difficulties were with his brother, with whom he had a love/hate relationship, and with his mother (*id.* at 80, 670). A licensed social worker at the Baystate Program observed that members of the BHN team had "processed with his parents about their tendencies to overreact to his behaviors, and how their expectations for his behaviors were not in step with his abilities based on his history" (*id.* at 820). A.G.C. did "very well" at the partial hospitalization program, "but his family had difficulty receiving . . . praise for his positive behaviors" (*id.*). This evidence supports the ALJ's conclusion that, although A.G.C's impairments could be expected to produce the behavioral manifestations described by his mother, the ALJ could reasonably view the mother's reports about her son's behavioral symptoms as somewhat overstated or exaggerated. "Making this finding falls within the ALJ's province; there is no error here." *Miller ex. Rel K.M.*, 2011 WL 2462473, at *13.

In conclusion, with respect to the ALJ's findings that A.G.C. had less than marked limitations in the domains of attending and completing tasks and interacting and relating with others, "[t]he ALJ properly examined conflicting evidence in this record, and reached a conclusion that is amply supported by substantial evidence. . . . With no error in the ALJ's evaluation of the medical opinions and other evidence of record, there is no basis for remand of the denial of benefits." *Costa*, 2016 WL 7974120, at *8.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's motion to affirm the decision is GRANTED. Judgment shall enter for the defendant, and the Clerk's Office is directed to close the case on the court's docket. It is so ordered.

Dated: March 16, 2017                                       <u>Katherine A. Robertson</u>
                                                            KATHERINE A. ROBERTSON
                                                            UNITED STATES MAGISTRATE JUDGE